**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KIMBERLY BUCKNER, | CASE NO. 1:15-cv-00175-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL** |
| Defendant. | Docs. 1, 9, 10, 15, 18, 21 |

**REPORT AND RECOMMENDATION**

## I.      Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Kimberly Buckner ("Plaintiff") for supplemental security income ("SSI")  and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.*, §§416.901 *et. seq.*[1] (the "Regulations"). Plaintiff asserts that the ALJ erred in assessing her mental limitations. Plaintiff relies primarily on her subjective reports, third-parties' subjective reports, and an opinion from a one-time

---

[1] Part 404 governs DIB, Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

consultative examiner. (Pl. Brief); (Pl. Reply). However, the ALJ properly relied on two medical opinions from reviewing psychologists to assign limited weight to the one-time consultative examiner. (Tr. 9-28). The ALJ properly found Plaintiff to be less than fully credible based on these two medical opinions, her conservative treatment, non-compliance with treatment, drug-seeking behavior, and activities of daily living, including working full-time. *Id.* The ALJ properly assessed the third-party reports. *Id.*

The Court reviews the ALJ's denial under the deferential substantial evidence standard, where the Court affirms the denial unless no reasonable person would have denied benefits. *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Here, Plaintiff fails to demonstrate that no reasonable person would deny her benefits. (Pl. Brief); (Pl. Reply). The Court would refuse to direct a verdict in Plaintiff's favor "if the trial were to a jury." *Id.* The Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On June 17, 2010, Plaintiff applied for SSI and DIB. (Tr. 176-84). On October 17, 2011, the Bureau of Disability Determination ("state agency") denied Plaintiff's application (Tr. 77-124), and Plaintiff requested a hearing. (Tr. 125-28). On May 6, 2013, an ALJ held a hearing at which Plaintiff's husband, Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 35-68).   On May 8, 2013, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 9-28). Plaintiff requested review with the Appeals Council (Tr. 6-8), which the Appeals Council denied on December 9, 2014, affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On January 26, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On April 8, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On August 4, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 15). On October 8, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 18). On October 28, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 21). On June 29, 2015, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.   Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20

C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.   Relevant Facts in the Record

Plaintiff was born in 1974 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 22); 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a nursing assistant and a materials handler. (Tr. 22). Plaintiff applied for benefits in May of 2008, and her application was denied in October of 2008. (Tr. 80). She alleges onset of disability under the present application as of July 28, 2010. (Tr. 14). The relevant period runs through May 8, 2013, the date of the ALJ decision. (Tr. 14).

In connection with Plaintiff's previous application for benefits under the Act, she underwent a consultative examination with state agency psychologist Dr. Christopher Royer, Ph.D. (Tr. 508). She reported "very infrequent alcohol use and no substance abuse…a history of some cannabis use." (Tr. 509). She denied "perceptual disturbances or other gross psychopathology." (Tr. 510).   Her judgment was fair, her recent and immediate recall were intact, her attention was fair, she made no errors on a serial 3 test of concentration, her reasoning by analogy was within normal limits, she was able to adequately generate abstract characterizations, her fund of information was adequate, and she exhibited tension, anxiety, and psychomotor agitation.  (Tr. 510-11).

On February 18, 2010, Plaintiff followed-up with her primary care physician, Dr. Louis Hieb. (Tr. 655). Plaintiff was "basically just out of prison" for "misusing opiates." (Tr. 655). Plaintiff had tested positive for cocaine and opiates in December and October of 2009. (Tr. 692, 695). Examination indicated "[s]he looks pretty good. She is calm and coherent. There is no agitation. Her thought process is fairly good, not tremendously insightful but pretty good and I think overall she has really had a significant improvement since getting back on her psych meds. She refused to go to psychiatry. Her lungs are clear. Patient breathing easily. Psychiatrically she is stable." (Tr. 655). On March 19, 2010, Dr. Hieb observed that Plaintiff had normal judgment, insight, orientation, memory, mood, and affect. (Tr. 653).

On March 22, 2010, Plaintiff had a psychosocial evaluation at Roxbury Treatment Center for opiate abuse. (Tr. 592). She was "neatly dressed and cooperative…remained focused and her mood was broad. Her remote memory was poor, but current is good. Her judgment has improved and she is desirous of help." (Tr. 591, 593). Plaintiff attended sessions at Roxbury Treatment Center through August 3, 2010. (Tr. 581-82). On May 4, 2010, Plaintiff reported that her "best friend with whom she lived for 10 years was admitted to the hospital in a diabetic coma on 4/7/10, He died on 5/3/10." (Tr. 595).

On May 7, 2010, Plaintiff followed-up with Dr. Hieb. (Tr. 652). He noted that she was "little anxious today, but overall again, much, much better than she was a year or two ago. Much more coherent." (Tr. 652). He continued, "Psychiatrically, she is essentially stable. She has a little bit of situational stress. She doesn't seem to have great insight into that, which is not too uncommon, but no suicidal ideation." (Tr. 652). Plaintiff was treating at Roxbury three times per week. (Tr. 651). Examination indicated normal judgment, insight, orientation, memory, mood, and affect. (Tr. 650). He increased her Adderall and encouraged Plaintiff to stop smoking. (Tr. 652).

On May 24, 2010, Plaintiff was "stepp[ed] down" to outpatient therapy from intensive outpatient therapy at Roxbury Treatment Center. (Tr. 596). On June 4, 2010, Plaintiff followed-up with Dr. Hieb. (Tr. 649). She was "under a lot of stress" because she was "having great difficulty finding a job." (Tr. 649). She requested that paperwork be completed for medical assistance and food stamps. (Tr. 649). He observed that "[s]he still looks pretty good compared to in the past in terms of her overall appearance and mental functioning…Psychiatrically she is stable." (Tr. 649).

Plaintiff applied for benefits under the Act alleging disabling symptoms later that month. (Tr. 229). Plaintiff reported "[I] get real nervous and antsy around other people and [I] always think they're talking about me or watching me…[I]

have problems concentrating on one thing at a time and its gets harder to complete one task. [I] start to become sorta like a perfectionist when [I] start to focus on something. my thoughts race to where [I] forget where [I] am and what [I]'m doing. [I] lose focus." (Tr. 229).

On June 17, 2010, Plaintiff had a face-to-face interview with a state agency employee. (Tr. 226). The employee observed no problem hearing, reading, understanding, coherency, concentrating, talking, or answering, although she "didn't make much eye contact." (Tr. 225).

On July 11, 2010, Plaintiff's friend, Jennifer Christopher, completed a Third Party Function Report. (Tr. 234-46). She reported that Plaintiff had problems sleeping, but good hygiene because she is a "clean freak." (Tr. 235). She reported that Plaintiff will "become withdrawn and distant and gets agitated badly." (Tr. 236). She reported that Plaintiff is "very moody and compulsive." (Tr. 238). She reported that Plaintiff has problems getting along with others, concentrating, memory, and completing tasks, but followed instructions "very well." (Tr. 239). She reported that Plaintiff does not handle stress well and becomes very agitated. (Tr. 240). She reported that Plaintiff is "very unstable," obsessively talks about license plates, will become "very combative," is "very paranoid," and cannot be a full-time parent because she is "all over the place." (Tr. 240-46).

On July 13, 2010, Plaintiff reported syncopal episodes to Dr. Hieb that were "evaluated several years ago and it turned out to be somehow related to her elevated lithium levels, although her bipolar is doing very well with the lithium." (Tr. 646). Plaintiff was scheduled to get her lithium levels checked. (Tr. 646). Dr. Hieb noted that Plaintiff had insurance, but might need to change insurance carriers. (Tr. 646).  Dr. Hieb noted "[b]asically, she feels good. She says she is doing well. She has a job. She is basically working as a bathroom attendant at the car shows, I think getting tips, but she said she made like $200.00 over three days and she was very pleased with that." (Tr. 646). Examinations in June, July, September, and October of 2010 indicated normal judgment, insight, memory, mood, and affect. (Tr. 637, 640, 644, 647).

On July 15, 2010, Plaintiff completed a Function Report. (Tr. 256). She reported pain and fatigue. (Tr. 257-59). She reported problems with memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 254). She reported that she did not handle stress well and was paranoid. (Tr. 255).  She reported irritation and that it is "hard to settle down w/this adhd/add." (Tr. 249). She reported problems sleeping and showering. (Tr. 250).  She reported that she did not go out alone because she gets "faint spells." (Tr. 252). She did not mention working as a bathroom attendant. (Tr. 249-59). She

reported that problems concentrating interfere with her ability to get along with others. (Tr. 254).

On July 28, 2010, state agency psychologist Dr. Stanley Schneider, Ed.D, performed a consultative examination and authored a medical opinion. (Tr. 544). Plaintiff reported recurrent homicidal ideation, auditory hallucinations, visual hallucinations, obsessions "about everything," "a lot" of paranoia, and a phobia of silence. (Tr. 544-53). She exhibited impaired judgment, attention, concentration, mumbling speech, and was unable to perform abstractions. (Tr. 544-53). She reported having her first drink at age 7, "primarily being a binge drinker," and "her first drug use at age 12, beginning with marijuana and using a variety of illicit drugs and substance over the years including cocaine, heroin, hallucinogens, LSD, PCP, and possibly others." (Tr. 547).  Plaintiff reported that she had been "clean and sober" since January of 2010. (Tr. 553).  She reported that her last alcohol drink was "in October of 2009, coinciding with her DUI." (Tr. 547). She reported that she had lost her certification as a certified nursing assistant after a drug charge. (Tr. 547). She reported being in "11 rehabs and 9 halfway houses." (Tr. 547). She reported being in outpatient mental health treatment for a dual diagnosis at Roxbury. (Tr. 545). Plaintiff reported that she lost her last job in March of 2010 when she was fired because she did not have transportation. (Tr. 545). She had been fired in the past for being drunk and pushing a supervisor. (Tr. 548). She

explained that "the Welfare suggested" she apply for disability benefits under the Act, and was "on public assistance." (Tr. 548). When asked if she could work, she said "I'd like to think so." (Tr. 548). She reported "generally having positive relationships with coworkers and supervisors when she worked." (Tr. 548). Dr. Schneider diagnosed Plaintiff with bipolar disorder, along with rule out depression "with psychotic features," rule out "paranoid schizophrenia (by history)," and borderline personality features. (Tr. 544-53). Dr. Schneider opined that she had marked limitations in responding to work pressures and to changes in the work setting. (Tr. 552). He explained that she had a "lot of anticipatory anxiety, jittery and nervous, does not like change." (Tr. 552).

On August 6, 2010, state agency psychologist Dr. Roger Fretz, Ph.D., reviewed Plaintiff's file and authored an opinion. (Tr. 557). He opined that she had no more than moderate limitation. (Tr. 556-57, 570). He explained that the only diagnosis supported by the record was Bipolar Disorder. (Tr. 556). He noted that she reported she was able to perform activities of daily living and her treatment included no "recent hospitalizations." (Tr. 556). Dr. Fretz noted that "[t]here are discrepancies in her account. She admits to significant drug abuse in recent CE however is noted to deny use in several earlier reports. She indicates that she is unable to drive. The evidence reveals loss of license secondary to DUI. She also presents differing symptoms and history between current [consultative

examination] and '08 [consultative examination]." (Tr. 556).  Dr. Fretz concluded that Plaintiff was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (Tr. 559).

On September 16, 2010, Dr. Hieb noted that Plaintiff was "bipolar and is a somewhat difficult historian." (Tr. 642). She reported that her syncopal episodes had "decreased lately." (Tr. 642). Her lithium level in July 2010 was ".71, normal is 0.6 to 1.2." (Tr. 642, 690). He indicated that "psychiatrically, she seems stable…again declines psychiatry, even though she has insurance." (Tr. 642). Dr. Hieb encouraged her to quit smoking and switched her Seroquel XR to Seroquel 400 mg because the extended release was making her drowsy. (Tr. 642). In October, Plaintiff reported that she "had not been having any of those syncopal or near syncopal episodes." (Tr. 639). Dr. Hieb opined that "psychiatrically, she is stable" and that she "probably [has] a low tolerance for pain." (Tr. 639).

In October of 2010, Plaintiff underwent a consultative physical examination with Dr. Ronald Vandergriff, D.O. (Tr. 600). Plaintiff reported problems concentrating, pain, and seizure activities that happen about once a month. (Tr. 600). She "denied any alcohol or street drugs." (Tr. 601). Dr. Vandergriff observed that Plaintiff was "awake, alert, oriented x3, answering questions in an appropriate manner. Eye contact was fair to good throughout the entire visit." (Tr. 603). Her motor behavior "showed slightly restless speech quantity, minimally responsive,

speech quality appeared to be slightly slurred and soft-spoken." (Tr. 604). Plaintiff's thought process was "logical, coherent, [and] cooperative," her memory was intact, and her insight and judgment were adequate. (Tr. 604). She denied any suicidal or homicidal ideation. (Tr. 604). Dr. Vandergriff opined that Plaintiff should see a psychiatrist and a therapist, and opined that she could perform a range of sedentary work. (Tr. 604-07).

On October 6, 2010, Plaintiff underwent a neurology consultation with Dr. Xi Lin, M.D. (Tr. 612). Plaintiff complained of seizures that occurred "about 9-10 times" in the previous "4-5 years." (Tr. 613). She reported four seizures over the previous four months. (Tr. 613) Examination indicated "normal affect and expression…normal memory with normal attention span…normal speech and volume, no aphasia, good insight." (Tr. 614). Neurological examination was normal. (Tr. 614-15). Dr. Lin scheduled Plaintiff for diagnostic testing. (Tr. 612). There is no evidence Plaintiff conveyed her report that her syncopal episodes were "related to her lithium levels."(Tr. 612-16, 642, 646, 690). Instead, Plaintiff told Dr. Lin that her lithium had "never been checked around the time when she had those episodes." (Tr. 616).

On November 5, 2010, Dr. Lin noted that the diagnostic imaging was normal, and explained that it was "very possible that [seizure] events were related to elevated lithium level, and a level check should be done if it happens again."

(Tr. 616, 700, 706). Dr. Lin indicated that if Plaintiff continued having episodes, she would be treated with Lamictal. (Tr. 616). Examination again indicated "normal affect and expression …normal speech and volume, no aphasia, good insight." (Tr. 616).

On December 9, 2010, Plaintiff reported to Dr. Hieb that she had "no syncopal episodes since seeing the neurologist." (Tr. 636). Plaintiff reported she had been "very irritated lately and under a lot of stress." (Tr. 636). Dr. Hieb instructed Plaintiff to "use her inhalers a little bit more appropriately." (Tr. 636). Examination indicated normal judgment, insight, memory, mood, and affect. (Tr. 634).

On April 7, 2011, Plaintiff presented to Dr. Hieb complaining of ear pain. (Tr. 631). He noted that:

> She has been under a lot of stress. She says that she "wants to be someone else." Apparently she indicated that she had been taking her 15-year-old son's Adderall and somehow she got involved with Children and Youth. There was a drug screen done. She had very high levels of amphetamine. She was obviously taking more amphetamines than would have been prescribed for her. She also had cocaine which she explains she had not used in 15 years and they just happened to catch this one time that she got caught. She has had ongoing trouble. She did make an appointment for the Stevens Center and I think that may be because she suspects, as we had told her, that I am not going to give her amphetamines after abusing them, having elevated levels and also having cocaine in her urine.
>
> …

> I told her as soon as I came in the room that we were not going to be able to give her Adderall and I think she was trying to talk me out of it and then she got angry. I explained the inappropriateness and that it was unfeasible to continue giving her the Adderall, but she was angry and started crying a little bit.

(Tr. 631). Examination indicated normal judgment, insight, memory, mood, and affect. (Tr. 629). Plaintiff did not return to Dr. Hieb thereafter. Doc. 10.

On April 12, 2011, Plaintiff was evaluated at the Roxbury Treatment Center. (Tr. 715). She reported that she "got another DUI." (Tr. 715). She reported that she was living alone with her four year old niece. (Tr. 715). She reported that she was frustrated, depressed, helpless and hopeless. (Tr. 715). She denied mood swings, panic, anxiety, obsessive thoughts, grandiose thoughts, flight of ideas, hallucinations, and paranoia. (Tr. 715). She reported isolation, loss of interest, and that she was "stuck in grief." (Tr. 722). She explained that she was "experiencing a severe grief episode since the death of her friend last year." (Tr. 724).  Plaintiff indicated that she was "going to start seeing a new doctor." (Tr. 718). She reported that she "does not like her doctor" and was going to "start getting her medications at the Stephens Center." (Tr. 724). Plaintiff reported that she "works under the table." (Tr. 720). Examination indicated neat appearance, normal speech, no eye contact, cooperative behavior, distractible attention, fair memory, vacant facial expression, depressed and tearful mood, coherent thought process, poor judgment, and some insight. (Tr. 723). Providers diagnosed her with alcohol abuse and

cocaine abuse and assigned her a GAF of 46. (Tr. 723). Plaintiff no-showed for three scheduled orientation sessions. (Tr. 725-27).

On May 6, 2011, had a face-to-face interview with a state agency employee. (Tr. 283). The employee observed no problem hearing, reading, understanding, coherency, concentrating, talking, or answering, although she "appeared nervous and a little fidgety during the interview." (Tr. 283-84).

On May 17, 2011, Jennifer Christopher submitted another Function Report. (Tr. 293). She reported that Plaintiff had an eating disorder and sometimes "hears voices." (Tr. 294). She reported that Plaintiff has panic attacks, cannot make decisions, and has problems sleeping. (Tr. 294). She reported that Plaintiff does not use the stove because she is "very easily distracted." (Tr. 295). She reported that Plaintiff has problems understanding, following instructions, and getting along with others. (Tr. 298). She reported that Plaintiff can pay attention for "2 min[utes]" and does not complete tasks. (Tr. 298). She reported that Plaintiff does not get along well with authority figures and is "awful" at handling stress. (Tr. 299).

Plaintiff also completed another Function Report. (Tr. 313-20). She reported problems with memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 319). She reported that she has mood swings, hears voices in her head, and that she did not feel safe in the

workplace because of her "seizures." (Tr. 313-14). She reported that she paces around and is a "compulsive person." (Tr. 315). She reported that it was "really hard for her to make decisions." (Tr. 315). She reported that she had a hard time getting along with authority and that she experienced abnormal fears and paranoia. (Tr. 320).

On June 6, 2011, Plaintiff presented to Dr. William Nasuti, D.O. (Tr. 770). Dr. Nasuti prescribed Adderall, but explained that he would not continue to prescribe Adderall if Plaintiff did not attend a psychiatry consultation. (Tr. 772). Plaintiff reported "depressed mood, diminished interest or please, manic episodes, and panic attacks" and denied "anxious, fearful thoughts, compulsive thoughts or behaviors, fatigue or loss of energy,  feelings of guilt or worthlessness, hallucinations, poor concentration, indecisiveness, restlessness or sluggishness, significant change in appetite…sleep disturbance or thoughts of death or suicide." (Tr. 770). Plaintiff reported fidgeting and squirming, but denied being bored easily, having difficulty waiting for a turn, being disorganized or excitable, making frequent careless mistakes, frustrated easily, impulsiveness, inattentiveness, losing or forgetting things frequently, having poor self-image, recklessness, restlessness, having a short attention span, talking excessively, being unable to follow directions, and being distracted easily. (Tr. 770).  He noted that Plaintiff reported respiratory symptoms, and instructed her to stop smoking. (Tr. 772). Plaintiff

reported a "history of alcohol use, was consumed rarely." (Tr. 771). Examination was normal. (Tr. 771).

On July 26, 2011, Dr. Nasuti noted that Plaintiff had missed her first appointment with a psychiatrist, and that if she "isn't seen by Sept 1st, I will NOT RX any more meds." (Tr. 767). On July 26, 2011, Plaintiff failed to show up at a consultative examination. (Tr. 748).  On August 30, 2011, Dr. Nasuti observed that Plaintiff was "oriented to time, place, person and situation…behaviors appropriately for age, has normal insight, exhibits normal judgment, and does not have suicidal ideation…demonstrates the appropriate mood and affect." (Tr. 765). On September 27, 2011, Plaintiff reported having a syncopal episode over the previous weekend. (Tr. 760). Examination indicated that Plaintiff was "oriented to time, place, person and situation… has normal insight, exhibits normal judgment, …demonstrates the appropriate mood and affect." (Tr. 762). Dr. Nasuti referred Plaintiff back to Dr. Lin. (Tr. 762). On October 27, 2011, Plaintiff reported that her attention deficit disorder was "moderate" and "stable." (Tr. 757). She was treating "at Pressly Center." (Tr. 757). Examination indicated that Plaintiff was "oriented to time, place, person and situation… has normal insight, exhibits normal judgment, …demonstrates the appropriate mood and affect." (Tr. 759).

On June 15, 2011, state agency psychologist Dr. Jonathan Rightmyer, Ph.D, reviewed Plaintiff's file and authored a medical opinion. (Tr. 85). He reviewed

Plaintiff's Function Report and Third Party Function Report, along with medical records from Roxbury, Dr. Lin, and Dr. Nasuti. (Tr. 85). Dr. Rightmyer opined that Plaintiff had no more than moderate limitation in any work-related function. (Tr. 84-85, 87-88). He explained that  Plaintiff's report was only partly credible and noted that there was no treating source opinion in the record that supported her claim. (Tr. 85). He indicated that the only diagnoses that were supported in the record were for bipolar disorder and anxiety.  (Tr. 87).

On October 5, 2011, Plaintiff underwent a consultative physical examination with Dr. Thomas McLaughlin, M.D. (Tr. 729). Examination indicated no physical abnormalities. (Tr. 731-32). Dr. McLaughlin noted that Plaintiff was "able to understand normal spoken speech and follow instructions and has a good knowledge of recent and remote medical history…cooperative with the evaluation." (Tr. 731). She was "awake, alert and oriented to time, place and person and was able to engage in appropriate conversation, answer questions appropriately and follow directions. Affect was appropriate to the situation." (Tr. 733). He opined that Plaintiff had no physical limitations. (Tr. 738-39).

 On January 27, 2012, Dr. Nasuti noted, "still hasn't seen psych. I will set up a psych and neurology consult at HMC once I see her old CT brain and EEG." (Tr. 754). Examination indicated that Plaintiff was "oriented to time, place, person and situation… has normal insight, exhibits normal judgment, …demonstrates the

appropriate mood and affect." (Tr. 755). On February 21, 2012, Plaintiff reported to Dr. Nasuti that "previous workup [for syncope] didn't reveal a cause." (Tr. 751). Examination indicated that Plaintiff was "oriented to time, place, person and situation… has normal insight, exhibits normal judgment, …demonstrates the appropriate mood and affect." (Tr. 752). Plaintiff was instructed to check her lithium level. (Tr. 753). There is no evidence that Plaintiff obtained her lithium level or returned to Dr. Nasuti thereafter. Doc. 10.

Plaintiff attended an orientation session, a session of individual counseling, and two sessions of group therapy at Roxbury Treatment Center in March and April of 2012. (Tr. 778). She had been sentenced to sixty days in jail for her second DUI. (Tr. 780). Plaintiff reported depression, but denied feeling helpless or hopeless, having mood swings, panic, anxiety, obsessive thoughts, grandiose thoughts, flight of ideas, hallucinations, or paranoia. (Tr. 780). Plaintiff reported that she supported herself with her husband's income and a "side job cleaning for people." (Tr. 785). She reported that she spent time with her husband and children, and was "proud of [herself]," although she was still grieving the loss of her friend. (Tr. 787). Examination indicated casual appearance, normal speech, good eye contact, cooperative behavior, normal attention, fair memory, calm facial expression, broad mood and affect, coherent thought process, fair judgment, and

some insight. (Tr. 788). She was diagnosed with polysubstance dependence and assessed a GAF of 51. (Tr. 788).

Plaintiff was discharged from Roxbury when she was incarcerated on April 11, 2012. (Tr. 789). She remained incarcerated through August of 2012. (Tr. 39). While in jail, she worked forty hours a week packing cereal. (Tr. 39-40, 42-44, 221). After being released from jail, she "thought [she] had a job still, but…they gave it away" because "it's cheaper to hire an inmate than…anyone off the street." (Tr. 44).

Plaintiff established care with a new primary care provider, Dr. Sandra Fowler, M.D., who prescribed Plaintiff Adderall, along with muscle relaxants, Vicodin, lithium, Keppra, and other medications. (Tr. 808). Plaintiff submitted minimal records from Dr. Fowler. (Tr. 805-08). Aside from these records, there is no evidence of treatment from April of 2012 through the ALJ decision on May 8, 2013. Doc. 10.

On May 6, 2013, Plaintiff appeared and testified before the ALJ. (Tr. 31). She testified that she was unable to work because her health was worse after being in jail. (Tr. 47). She asked to take a break, and refused to continue with the hearing. (Tr. 47). Instead, her husband, Charles Buckner, appeared and testified. (Tr. 47). He testified that Plaintiff "doesn't like to be around people" and was "always in

pain." (Tr. 49). He testified that he had talked to Plaintiff outside in the hall after she left, and:

> She was like -- she's like I don't know what to say. She didn't understand it. She couldn't understand what you was trying to tell her. You know, she's out there like freaking out. She's just so angry because she just couldn't adapt to what you were saying, comprehend what you were saying to her. She was like , I don't know what to say. And I'm like calm down, honey. She's out there just crying, freaking out –
> …
> I see this all the time even when I question her.

(Tr. 49). He testified that she had problems being around his family and does not remember appointments, which was "very frustrating" for him. (Tr. 53). He testified that Plaintiff did "side jobs" cleaning with her mother. (Tr. 56). He testified that Plaintiff's biggest obstacles to working were her memory and her attitudes. (Tr. 63). He testified that she would forget food on the stove when she was cooking. (Tr. 65). He also testified that she had "very bad swings" and "flips out." (Tr. 67).

A vocational expert also appeared and testified. (Tr. 72). The VE testified that there were jobs in the national economy that Plaintiff could perform, given the RFC assessed by the ALJ. (Tr. 73). The VE also testified that there would be jobs in the sedentary range. (Tr. 73).

On May 8, 2013, the ALJ issued the decision. (Tr. 23). The Court discusses the findings relevant to this appeal in detail below.

## V.     Plaintiff Allegations of Error

### A.     Medical Opinions

Plaintiff notes that Dr. Schneider's opinion supports her limitations. (Pl. Brief at 2-3, 8); (Pl. Reply at 1-2). Plaintiff acknowledges that Dr. Rightmyer and Dr. Fretz opined to only moderate limitations. (Pl. Brief at 2-3, 6, 8). Aside from summarizing each medical opinion and the weight assigned to each, Plaintiff does not address the ALJ's assessment of the medical opinions. (Pl. Brief); (Pl. Reply).

 "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).   Medical opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)-(2).

The Regulations provide special deference to medical opinions from treating sources who have "seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment" ("treating source rule"). *See* 20 C.F.R. § 404.1527(c)(2). When there is no treating source opinion entitled to controlling weight, ALJ applies the factors in 20 C.F.R. §404.1527(c). Section 404.1527(c)(1) provides that, "[g]enerally, [the Commissioner] give[s]

more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion." *Id.*

If a statement or medical opinion is not subject to the treating source rule, the ALJ does not need to afford the statement or medical opinion any special deference or meet the "good reasons" requirement of 20 C.F.R. §404.1527(c)(2). When evidence is not entitled to special deference, the Court reviews the ALJ's resolution of an evidentiary conflict using the substantial evidence standard of review. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). As long as the ALJ "explain[s] in the decision the weight given" and a reasonable person would find the evidence adequate to discount the opinion, the Court will uphold the ALJ's assignment of weight to a non-treating source opinion. *See* 20 C.F.R.

§404.1527(e)(ii); *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation omitted).

The ALJ explained that she assigned "significant weight" to Dr. Rightmyer's opinion and Dr. Fretz's opinion because they were able to review Plaintiff's treatment records and supported their opinions. (Tr. 19-20). The ALJ assigned limited weight to Dr. Schneider's opinion because it was "inconsistent with the claimant's overall lack of psychological treatment or therapy and the claimant's own reported activities of daily living, as discussed below." (Tr. 20). Plaintiff does not explain why the ALJ was not entitled to rely on two medical opinions to reject Dr. Schneider's single non-treating source opinion. (Pl. Brief); (Pl. Reply). The Third Circuit has affirmed an ALJ who relies on two reviewing medical opinions, even when rejecting a treating source. *See Brown v. Astrue*, 649 F.3d 193 (3d Cir. 2011); Local Rule 84.40.4(b) ("The court will consider only those errors specifically identified in the briefs").

Plaintiff elsewhere argues that the ALJ erred in considering her activities of daily living. The ALJ did not err in considering Plaintiff's activities of daily living. (Pl. Reply at 1-2). The ALJ specifically cited her "ability to perform her work release jobs." (Tr. 21). These activities rose to the level of substantial gainful activity, performed on a regular and continuing basis. (Tr. 21). Performing activities at the level of substantial gainful activity on a regular and continuing

basis directly contradicts Dr. Schneider's opinion. (Tr. 544-53). Activities that are inconsistent with a medical opinion may be used to discount the medical opinion, even when it is from a treating source. Explanatory guidance from the Social Security Administration provides that:

> Although we would expect it to be an extremely rare occurrence, it is possible that a treating source's opinion about the nature or severity of a claimant's impairment(s), even one that is well-supported by medically acceptable clinical and laboratory findings, may nevertheless be contradicted, and even outweighed, by substantial nonmedical evidence. For example, an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936; *see also Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (citing *Torres v. Barnhart*, 139 F. App'x 411, 414 (3d Cir. 2005) (ALJ permissibly rejected treating opinion "in combination with other evidence of record including Claimant's own testimony"); *Kays v. Colvin*, No. 1:13-CV-02468, 2014 WL 7012758, at *7 (M.D. Pa. Dec. 11, 2014) ("limitations in lifting or carrying imposed by [the physician] were inconsistent with [claimant's] own testimony"); *Marr v. Colvin*, No. 1:13-cv-2499 (M.D.P.A. April 15, 2015) (ALJ properly rejected treating source medical opinion that claimant could not sit for more than two hours out of an eight-hour workday when she regularly sat for almost six hours at a time); *cf. Chunn v. Barnhart*, 397 F.3d 667,

672 (8th Cir. 2005) ("the ALJ's decision fails to explain how Chunn's activities and behaviors are inconsistent with Dr. Ziolkow's characterization of her mental capacity.").

Even if the ALJ had erred in considering her activities of daily living, "whether [this] error is harmless depends on whether the other reasons cited by the ALJ" provide substantial evidence to reject Dr. Schneider's opinion. *Brumbaugh v. Colvin*, 3:14-CV-888, 2014 WL 5325346, at *16 (M.D. Pa. Oct. 20, 2014). The ALJ also found that Dr. Scheider's opinion was inconsistent with the record and less supported than the other two medical opinions. Both are accurate characterizations of the record and proper reasons to assign less weight to Dr. Schneider's opinion. *See* 20 C.F.R. § 404.1527(c)(3)-(4) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion... the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Dr. Fretz and Dr. Rightmyer supported their opinions with extensive narrative explanations and summaries of the relevant facts. (Tr. 101, 556-70).

Dr. Scheider's opinion was inconsistent with Plaintiff's course of treatment. Plaintiff repeatedly "decline[d] psychiatry, even though she has insurance." (Tr.

642). She essentially treated with only a primary care provider, Dr. Hieb, until he refused to continue prescribing her Adderall after she overused it and took cocaine, and then simply sought out another primary care provider. (Tr. 631).  After Dr. Nasuti balked at providing Plaintiff with Adderall, she found another primary care provider, Dr. Fowler. (Tr. 805-08). However, aside from minimal records from Dr. Fowler, Plaintiff produced no evidence of treatment from April of 2012 until the ALJ decision in May of 2013. Doc. 10.

Dr. Schneider's opinion was in July of 2010, while Dr. Hieb's examinations in June, July, September, and October of 2010 indicated normal judgment, insight, memory, mood, and affect. (Tr. 637, 640, 644, 647). Dr. Lin observed "normal affect and expression…normal memory with normal attention span…normal speech and volume, no aphasia, good insight." (Tr. 614, 616). Dr. Nasuti observed that Plaintiff was "oriented to time, place, person and situation…behaviors appropriately for age, has normal insight, exhibits normal judgment, and does not have suicidal ideation…demonstrates the appropriate mood and affect." (Tr. 752, 755, 759, 765, 770). Examination at Roxbury in March of 2012 indicated casual appearance, normal speech, good eye contact, cooperative behavior, normal attention, fair memory, calm facial expression, broad mood and affect, coherent thought process, fair judgment, and some insight. (Tr. 788). There are no mental

status examinations in the record from April of 2012 until the ALJ's decision in May of 2013. Doc. 10.

Plaintiff reported multiple psychotic symptoms to Dr. Schneider, including homicidal ideation, paranoia, auditory hallucinations, visual hallucinations, compulsions, and phobias. (Tr. 544-53). As a result, he diagnosed her with rule out depression "with psychotic features" and paranoid schizophrenia, along with borderline personality features. (Tr. 544-53). There is no evidence in the record that Plaintiff reported these symptoms to her treating providers or that her providers diagnosed her with these impairments. Doc. 10. On April 12, 2011, Plaintiff was evaluated at the Roxbury Treatment Center and denied mood swings, panic, anxiety, obsessive thoughts, grandiose thoughts, flight of ideas, hallucinations, and paranoia. (Tr. 715). On June 6, 2011, Plaintiff had her first evaluation with Dr. Nasuti, and denied "anxious, fearful thoughts, compulsive thoughts or behaviors, fatigue or loss of energy,  feelings of guilt or worthlessness, hallucinations, poor concentration, indecisiveness, restlessness or sluggishness, significant change in appetite…sleep disturbance or thoughts of death or suicide, " being bored easily, having difficulty waiting for a turn, being disorganized or excitable, making frequent careless mistakes, frustrated easily, impulsiveness, inattentiveness, losing or forgetting things frequently, having poor self-image, recklessness, restlessness, having a short attention span, talking excessively, being

unable to follow directions, and being distracted easily. (Tr. 770).  In March of 2012, Plaintiff was again evaluated at Roxbury, and denied feeling helpless or hopeless, having mood swings, panic, anxiety, obsessive thoughts, grandiose thoughts, flight of ideas, hallucinations, or paranoia. (Tr. 780).

Dr. Schneider's consultative examination was also inconsistent with the physical consultative examinations. Dr. McLaughlin noted that Plaintiff was "able to understand normal spoken speech and follow instructions and has a good knowledge of recent and remote medical history…cooperative with the evaluation." (Tr. 731). She was "awake, alert and oriented to time, place and person and was able to engage in appropriate conversation, answer questions appropriately and follow directions. Affect was appropriate to the situation." (Tr. 733). Dr. Vandergriff observed that Plaintiff was "awake, alert, oriented x3, answering questions in an appropriate manner. Eye contact was fair to good throughout the entire visit." (Tr. 603). Her motor behavior "showed slightly restless speech quantity, minimally responsive, speech quality appeared to be slightly slurred and soft-spoken." (Tr. 604). Plaintiff's thought process was "logical, coherent, [and] cooperative," her memory was intact, and her insight and judgment were adequate. (Tr. 604). She denied any suicidal or homicidal ideation. (Tr. 604).

Dr. Schneider's opinion was not from a treating source. (Tr. 544-53). The ALJ was not required to give special deference to his medical opinion. *See* 20 C.F.R. §404.1527(c)(2). The Court reviews the ALJ's assessment of non-treating medical opinions under the deferential substantial evidence standard. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict." *Id.* (internal quotation omitted). Plaintiff has failed to demonstrate that no reasonable person would have assigned less weight to Dr. Schneider's opinion based on Dr. Rightmyer's opinion, Dr. Fretz's opinion, Plaintiff's lack of psychiatric treatment, and contradictions between Dr. Schneider's opinion and the record. Substantial evidence supports the ALJ's assignment of weight to the medical opinions. *Id.*

## B.    Credibility

Plaintiff asserts that the ALJ erred in evaluating her credibility and the credibility of the third-parties. (Pl. Brief at 14). Plaintiff asserts that the ALJ failed "to explain how 96-7p was applied." (Pl. Brief at 14). Plaintiff asserts that, "rather than evaluate the intensity, persistence, and limiting effects of [Plaintiff's] alleged

symptoms, the Administrative Law Judge simply dismissed the Plaintiff's testimony as not credible." (Pl. Brief at 15). Plaintiff also asserts that the ALJ erred in relying on her activities of daily living. (Pl. Reply at 1-2).

The ALJ provided an extensive explanation for how 96-7p was applied. (17-22). The ALJ cited her conservative treatment, explaining that Plaintiff's "mental health treatment has been limited to follow-up appointments with her primary care physicians…she declined to see a psychiatrist." (Tr. 18). The ALJ noted that Plaintiff's primary care physician recommended that she see a psychiatrist in June of 2011, and in January of 2012, she "had yet to see a psychiatrist." (Tr. 18). She attended only "a few group therapy sessions in March and April 2012 prior to her five-month incarceration for her DUI conviction." (Tr. 19). The ALJ noted that "her brief treatment at Roxbury Treatment Center in 2012 was at the request of Children and Youth Services." (Tr. 21). The ALJ noted her non-compliance with treatment, explaining that "[i]n April 2011, after her positive drug screening, Children and Youth requested the claimant be evaluated for services at Roxbury Treatment Center again…the claimant's counselor noted the claimant's alcohol and cocaine abuse. She also noted that the claimant was charged with her second DUI in January of 2011 and her third DUI in April of 2011. She recommended that the claimant participate in an intensive outpatient program. The record indicates

that the claimant failed to attend her orientation appointment on three separate occasions." (Tr. 18).

The ALJ also cited Plaintiff's drug-seeking behavior, explaining that "[i]n April 2011, Dr. Hieb noted that the claimant's drug screen conducted by Children and Youth Services showed high levels of..amphetamine and a positive result for cocaine. Dr. Hieb explained…that he was not willing to prescribe her Adderall because of this misuse. Following her April 2011 appointment with Dr. Hieb, the claimant changed primary care providers." (Tr. 18). The ALJ notes that Plaintiff "misuses medications such as Adderall and her rescue inhaler." (Tr. 21). Finally, the ALJ cited Plaintiff's activities of daily living, specifically her "ability to perform her work release job." (Tr. 21).

In arguing that the ALJ should have credited her testimony, Plaintiff cites her subjective testimony, the third-parties' subjective reports, Dr. Schneider's opinion. (Pl. Brief at 14-17). However, as described above, the ALJ properly found that Dr. Schneider's opinion was entitled to little weight. *Supra.* As discussed below, the ALJ properly evaluated the subjective reports of the third-parties. *Infra.* Aside from citing Dr. Schneider's report and the third-party reports, Plaintiff does not directly address the ALJ's credibility reasoning. (Pl. Brief).

In Plaintiff's reply, she generally challenges the ALJ's reliance on her activities of daily living. (Pl. Reply). Even if the ALJ had erred in relying on her

activities of daily living, the error would be harmless. *See Brumbaugh v. Colvin*, 3:14-CV-888, 2014 WL 5325346, at *16 (M.D. Pa. Oct. 20, 2014). The ALJ also found that Plaintiff was not fully credible because of the medical evidence, as interpreted by Dr. Fretz and Dr. Rightmyer, her conservative course of treatment, non-compliance with treatment, separation from the workforce for reasons unrelated to disability, and ability to work full-time for several months in 2012. (Tr. 18-21).

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P. In assessing credibility, the Regulations instruct the ALJ to consider factors enumerated in 20 C.F.R. §404.1529.  The ALJ is first instructed to consider "objective medical evidence," which "is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor

disruption." 20 C.F.R. § 404.1529(c)(2). The ALJ is then instructed to consider "other evidence." 20 C.F.R. § 404.1529(c)(3). The ALJ may rely on medical opinions to interpret the objective evidence in assessing Plaintiff's credibility. *See Seever v. Barnhart*, 188 F. App'x 747, 754 (10th Cir. 2006) ("We will not fault the ALJ for failing to interpret [Plaintiff's] symptoms and test results differently than [a medical expert]") (citing *Winfrey v. Chater,* 92 F.3d 1017, 1022 (10th Cir.1996)). Consequently, the ALJ properly relied on the opinions of Dr. Fretz and Dr. Rightmyer in concluding that objective medical evidence failed to support Plaintiff's claim. (Tr. 18-21).

The Third Circuit explained in *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993):

> An ALJ must give serious consideration to a claimant's subjective complaints of pain… where those complaints are not supported by objective evidence… Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contrary medical evidence.

*Id.* at 1067-68 (internal citations omitted). . Because objective evidence supported Plaintiff's diagnoses, but not the allegedly disabling limitations arising out of those limitations, the ALJ was required to provider serious consideration to Plaintiff's claims, but was not required to assign them great weight. *Id.*

After an ALJ evaluates the objective medical evidence, the ALJ evaluates other evidence, including Plaintiff's course of treatment. *See* 20 C.F.R. §404.1529.

The ALJ properly relied on Plaintiff's conservative and non-compliant treatment. (Tr. 18-21); SSR 96-7P ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").  Plaintiff does not address or explain her conservative and non-compliant treatment. (Pl. Brief); (Pl. Reply).

The ALJ was also entitled to note Plaintiff's drug seeking behavior. *See Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir.2009); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir.2008); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir.2003); *Edlund v. Massanar*i, 253 F.3d 1152, 1157 (9th Cir.2001); *Marr v. Colvin,* No. 1:13–cv–2499, *Report and Recommendation* at *44, 52 (M.D.P.A. April 15, 2015) (citing *Vest v. Colvin*, 5:13CV00067, 2014 WL 4656207, at *33 (W.D. Va. Sept. 16, 2014);  *Similia v. Astrue*, 573 F.3d 503, 519 (7th Cir.2009); *Lewis v. Astrue*, 498 F.3d 909, 910 (9th Cir.2007)); *Greiner v. Colvin*, CIV.A. 12-1433, 2013 WL 4041964, at *7 (W.D. Pa. Aug. 8, 2013) (Upholding ALJ's conclusion that claimant was drug-seeking where her physician specifically noted in medical records that claimants "pain complaints [had] always been out of proportion to her illness" and"[t]here is a concern that she exhibits drug seeking behavior ...."); cf. *Russell-Harvey v. Colvin*, 3:12-CV-00953, 2014 WL 2459681, at *12 (M.D. Pa.

May 29, 2014) (Mariani, J.) (Finding that the ALJ erred in relying on drug-seeking behavior where "[n]o doctor ever mentioned any suspicion that [claimant] was lying or exaggerating her symptoms to receive narcotic drugs. No doctor ever stated that [claimant] was running out of her prescription medication sooner than she should have. In fact, multiple doctors noted that [claimant] was compliant with her medication and treatment plan"). The Court further notes that Plaintiff reported increased agitation and irritation during the period when she was abusing Adderall and cocaine and the period immediately after she lost her supply of Adderall and cocaine. (Tr. 631).  Her drug-seeking also relates to her conservative treatment; she continued to refuse to go to psychiatry until Dr. Nasuti told her that he would stop supplying her with Adderall if she did not go to psychiatry. (Tr. 787).

Plaintiff's separation from the workforce for non-disability related reasons is also relevant. Plaintiff indicated that she stopped working in April 5, 2010 due to her impairments (Tr. 286). However, Plaintiff told the consultative examiner that she was fired from her job because she did not have transportation and failed to show up (Tr. 545). This is consistent with the record. On February 18, 2010, Plaintiff was "basically just out of prison" for "misusing opiates." (Tr. 655). Plaintiff had tested positive for cocaine and opiates in December and October of 2009. (Tr. 692, 695). Examination indicated "[s]he looks pretty good. She is calm and coherent. There is no agitation. Her thought process is fairly good, not

tremendously insightful but pretty good and I think overall she has really had a significant improvement since getting back on her psych meds. She refused to go to psychiatry…Psychiatrically she is stable." (Tr. 655). On March 19, 2010, Dr. Hieb observed that Plaintiff had normal judgment, insight, orientation, memory, mood, and affect. (Tr. 653). On March 22, 2010, providers at Roxbury observed she was "neatly dressed and cooperative…remained focused and her mood was broad. Her remote memory was poor, but current is good. Her judgment has improved and she is desirous of help." (Tr. 591, 593). On May 7, 2010, Dr. Hieb noted she was a "little anxious today, but overall again, much, much better than she was a year or two ago. Much more coherent…Psychiatrically, she is essentially stable.." (Tr. 652). Examination indicated normal judgment, insight, orientation, memory, mood, and affect. (Tr. 650). On May 24, 2010, Plaintiff was "stepp[ed] down" to outpatient therapy from intensive outpatient therapy at Roxbury Treatment Center. (Tr. 596). On June 4, Dr. Hieb noted that Plaintiff was "under a lot of stress" because she was "having great difficulty finding a job." (Tr. 649). She requested that paperwork be completed for medical assistance and food stamps. (Tr. 649). He observed that "[s]he still looks pretty good compared to in the past in terms of her overall appearance and mental functioning…Psychiatrically she is stable." (Tr. 649). Plaintiff applied for benefits under the Act alleging disabling symptoms later that month. (Tr. 229).

Separation from the workforce for non-disability related reasons is relevant to credibility. *See e.g.*, *Hogan v. Apfel*, 239 F.3d 958 (8th Cir. 2001) (The closeness in time of plaintiff's on-the-job reprimand to her ceasing work cast doubt on her assertion that she quit her job because of pain and side effects of her pain medication); *Kane v. Colvin*, No. 3:13-CV-02469, 2015 WL 1513960, at *12 (M.D. Pa. Mar. 31, 2015) (noting that the plaintiff reported she was laid off because there was "not enough work for her," not because she was unable to work due to disability); *Pachilis v. Barnhart*, 268 F. Supp. 2d 473, 483 (E.D. Pa. 2003) (finding that a claimant incentive or disincentive to work is a permissible criterion bearing on his credibility).

Plaintiff asserts that the ALJ did not "consider" various credibility factors. "[T]here is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." SSR 06-3p; *see also Phillips v. Barnhart*, 91 Fed.Appx. 775, 780 (3d Cir. 2004) ("the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it") (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998)); *Francis v. Comm'r Soc. Sec. Admin.*, 414 Fed.Appx. 802, 804-05 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor

analysis…Procedurally, the regulations require no more.") (internal citations omitted).

If explanation allows meaningful judicial review, it suffices. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."); *Hur v. Comm'r Soc Sec.*, 94 F. App'x130, 133(3d Cir. 2004) ("There is no requirement that the ALJ discuss in its  opinion every tidbit of evidence included in the record").

"Neither the district court nor the Court of Appeals is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *see also Chandler v. Comm'r of Soc. Sec.*,  667 F.3d 356, 359 (3d Cir.2011) ("Courts are not permitted to re-weigh  the evidence or impose their own factual determinations" (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ is entitled to deference with regard to credibility determinations. *See  Szallar v. Comm'r Soc. Sec.*, No. 15-1776, 2015 WL 7445399,

at *1 (3d Cir. Nov. 24, 2015) ("the ALJ's assessment of his credibility is entitled to our substantial deference") (citing *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir.2014)). Plaintiff has failed to demonstrate that no reasonable person would have found her less than fully credible. *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (Court will affirm ALJ's factual findings unless no "reasonable mind" would reach the same conclusion) (internal quotation omitted). The Court would "refus[e] to direct a verdict" in Plaintiff's favor if this were a jury trial. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal quotation omitted). Substantial evidence supports the ALJ's assessment of Plaintiff's subjective complaints. *Id.* The Court does not recommend remand on these grounds.

Plaintiff also challenges the ALJ's assessment of the third-parties. The ALJ found that Plaintiff's husband and friend were not fully credible because they are not "medical professionals," their statements were "based upon the claimant's less than credible subjective complaints," and were internally inconsistent. (Tr. 21). The ALJ also assigned significant weight to the opinions of Dr. Fretz and Dr. Rightmyer, who both reviewed the third-party Function Reports. (Tr. 101, 556-70). Plaintiff asserts that the ALJ erred in assigning little weight to the third-parties' reports as being based on her subjective claims, because they were also based on their observation of Plaintiff. (Pl. Brief at 15-16). However, they were based

primarily on her subjective claims, which the ALJ properly found were less than fully credible. (Tr. 18-21).

Unlike Plaintiff's complaints, which require "serious consideration" even when not supported by objective evidence, Third Circuit precedent merely requires the ALJ to explicitly address third-party reports. *See Shoemaker v. Colvin*, No. 114CV02049SHRGBC, 2015 WL 9690310, at *13 (M.D. Pa. Dec. 18, 2015) *report and recommendation adopted*, No. 1:14-CV-2049, 2016 WL 107962 (M.D. Pa. Jan. 11, 2016) (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir.2000) ("we expect the ALJ to address the testimony of such additional witnesses")). Moreover, the Court can reasonably discern that the ALJ also rejected the third-party complaints for the same reason Plaintiff's complaints were rejected: they were inconsistent with the medical opinions of Dr. Fretz and Dr. Rightmyer and with Plaintiff's ability to work forty hours a week, her conservative treatment, her drug-seeking behavior, and her non-compliant treatment. (Tr. 18-21).

For example, the treatment record shows that on July 13, 2010, Dr. Hieb noted "[b]asically, she feels good. She says she is doing well. She has a job. She is basically working as a bathroom attendant at the car shows, I think getting tips, but she said she made like $200.00 over three days and she was very pleased with that." (Tr. 646). Examinations in June, July, September, and October of 2010

indicated normal judgment, insight, memory, mood, and affect. (Tr. 637, 640, 644, 647).   Two days earlier, Jennifer Christopher had completed a Third-Party Function report indicating that Plaintiff was agitated, moody, compulsive, could not handle stress, was very paranoid, could not be a full-time parent, was "very unstable," and had problems getting along with others, concentrating, memory, and completing tasks. (Tr. 234-46). Two days later, on July 15, 2010, Plaintiff reported that she had problems with memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 254). She reported that she did not handle stress well and was paranoid. (Tr. 255).   She reported irritation and that it is "hard to settle down w/this adhd/add." (Tr. 249). She reported problems sleeping and showering. (Tr. 250).   She reported that she did not go out alone because she gets "faint spells." (Tr. 252). She reported that problems concentrating interfere with her ability to get along with others. (Tr. 254). Neither mention that she was working as a bathroom attendant at the time and was "pleased" with this.  (Tr. 234-59). Consequently, the Court can reasonably discern why the ALJ found Jennifer Christopher and Plaintiff's husband to be less than fully credible. The Court does not recommend remand on these grounds.

## C.    RFC

Plaintiff asserts that the ALJ erred in failing to include limitations in the RFC reported by herself, the third –parties, and Dr. Schneider. (Pl. Brief at 18-20).

As discussed above, the ALJ properly found that Plaintiff and the third-parties were not fully credible and properly assigned limited weight to Dr. Scheider's opinion. *Supra*. The ALJ's RFC was supported by four medical opinions. *Supra.* The ALJ only needs to include credibly established limitations in the RFC. *See Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005). The Court does not recommend remand on these grounds.

### D.    Step Two

Plaintiff asserts that the ALJ erred in finding that her seizure-like episodes were non-severe because they were caused by side-effects of medication, not an impairment. (Pl. Brief at 17-18); (Tr. 15).   The Court agrees. Side-effects of medication must be considered in evaluating the RFC. *See* SSR 96-7p; SSR 96-8p.

However, the ALJ's error at step two was harmless. Step two is a threshold test, so when the evaluation process proceeds past step two, a claimant alleging an error at step two must articulate the harmful impact this had on subsequent steps. *See Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L. Ed. 2d 532 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination") (citing *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997) (Social Security claimant must demonstrate prejudice by ALJ error)) (other internal citations omitted). In *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005), the Third Circuit held that a "generalized response" that

obesity makes it "more difficult…to stand, walk and manipulate [the] hands and fingers" was "not enough to require a remand" based on an error at step two. *Id.* at 553.

Here, Plaintiff does not explain how her seizure-like episodes should have been included in the RFC. (Pl. Brief); (Pl. Reply). Even if Plaintiff had properly identified additional limitations to include in the RFC, the Court would find that substantial evidence supports the ALJ's RFC. The only evidence of Plaintiff's seizures or their effect on her functioning were her subjective claims. Her claims relating to seizures were particularly less credible.

Plaintiff did not report syncope-like episodes to Dr. Hieb until July of 2010, after she had applied for benefits. (Tr. 646). At that time, she told Dr. Hieb her syncopal episodes had been determined in the past to be "related to her lithium levels." (Tr. 646). He checked her lithium levels, and they were normal, so he referred her to a neurologist, Dr. Lin. (Tr. 612, 642, 646). There is no evidence Plaintiff told Dr. Lin that her syncopal episodes had been related to lithium in the past. (Tr. 612-16). Instead, even though she had just had her lithium levels checked by Dr. Hieb after an alleged episode, she told Dr. Lin her lithium "has never been checked around the time when she had these episodes." (Tr. 616). Consequently, Plaintiff underwent an extensive workup with Dr. Lin. (Tr. 612-16, 700, 706). When all of the testing was normal, Dr. Lin independently determined that it was

likely related to Plaintiff's lithium levels. (Tr. 616). Dr. Lin instructed Plaintiff to get her lithium levels checked if a syncopal episode happened again. (Tr. 616).

Instead, Plaintiff simply began reporting syncopal episodes to her new primary care provider, Dr. Nasuti, after she terminated her relationship with Dr. Hieb after he refused to continue prescribing Adderall given Plaintiff's cocaine and amphetamine abuse. (Tr. 631, 762). Dr. Nasuti referred Plaintiff back to Dr. Lin, but there is no evidence that Plaintiff followed-through on this referral. (Tr. 762). In February of 2012, she told Dr. Nasuti that "previous workup [for syncope] did not reveal a cause." (Tr. 751). Dr. Nasuti also independently determined that her syncope might be related to her lithium levels, and instructed Plaintiff to get her lithium levels checked. (Tr. 753). However, at the same time, he was threatening to stop prescribing Adderall because Plaintiff was refusing to comply with his condition that she see a psychiatrist. (Tr. 753). There is no evidence Plaintiff returned to Dr. Nasuti or got her lithium levels checked. Doc. 10. In the mean time, Plaintiff reported in her May 2011 Function Report that she did not feel comfortable in the workplace due to "seizures." (Tr. 313).

Plaintiff went to prison, and worked forty hours a week. (Tr. 43). After she was released from prison in August of 2012, there is no evidence she had her lithium levels checked. Doc. 10. She began treating with another new primary care physician, Dr. Fowler, who, unlike Dr. Nasuti and Dr. Hieb, was apparently willing

to prescribe Adderall without requiring psychiatric treatment. (Tr. 805-08). Dr. Fowler also began treating Plaintiff with Keppra, which is prescribed for seizures. (Tr. 805-08). However, Plaintiff only submitted three pages of treatment records from August of 2012 through March of 2013. (Tr. 805-08). These records are essentially just medication logs and do not indicate how Plaintiff reported her syncopal activity to Dr. Fowler. (Tr. 805-08).

Consequently, the treatment record indicates that Plaintiff made highly contradictory statements regarding the suspected cause of her syncopes, and was non-compliant in checking her lithium so that her alleged syncopes could be managed. *Supra.* If Plaintiff's seizures were actually limiting her function, and they were caused by lithium, Plaintiff would have gotten her lithium levels checked. Additionally, the ALJ's RFC was supported by four medical opinions. As discussed above, the ALJ properly relied on these opinions. *Supra.* Plaintiff has failed to demonstrate that the error in evaluating her seizure-like episodes was harmful. The Court does not recommend remand on these grounds.

## VI.   Conclusion

The Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181

F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by

        substantial evidence; and

II.     The Clerk of Court close this case.


The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The

briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: March 30, 2016                _____s/Gerald B. Cohn_____
                                           GERALD B. COHN
                                           UNITED STATES MAGISTRATE JUDGE